**PRINTING MART–MORRISTOWN, INC., a New Jersey corporation, Plaintiff,**

v.

**Bert ROSENTHAL, Larry Sinoway, Allan Essenfeld, Laurriet Printing Co., Inc. and Sharp Electronics Corp., Defendants.**

Civ. A. No. 86–3224.

United States District Court, D. New Jersey.

Jan. 5, 1987.

D. Gayle Loftis, Jersey City, N.J., for Printing Mart-Morristown, Inc.

Michael Meisel, Cole, Schotz, Bernstein, Meisel & Forman, Hackensack, N.J., for Rosenthal and Laurriet Printing Co., Inc.

Arthur Schmauder, Shanley & Fisher, Morristown, N.J., for Simoway and Sharp Electronics Corp.

## OPINION

SAROKIN, District Judge.

Defendants move before the court to dismiss plaintiff's complaint in this Racketeer Influenced and Organized Crime Act (RICO) action. *See* 18 U.S.C. Section 1962 *et. seq.* Defendants argue that failure to raise the RICO claim in an earlier state court action precludes plaintiff from subsequent litigation of this claim under New Jersey's "entire controversy doctrine".

The court grants this motion with great reluctance, since it results in barring what appears to be a meritorious claim by plaintiff. However, this claim, although lacking some of the evidence and further detail now known to plaintiff, was available to plaintiff at the time it instituted the state court action. The failure to assert the RICO claim in the state court proceeding, now bars plaintiff from doing so in this proceeding.

## FACTS

Plaintiff, Printing Mart-Morristown Inc., ("Printing Mart") is in the business of providing printing and printing related services. In 1978, Sharp Electronics contracted with Printing Mart to produce various catalogs and brochures for the electronics equipment it manufactures. The contract explicitly terminated in 1981, but Printing Mart remained Sharp's "in house" printer, completing numerous printing jobs and expanding to provide Sharp with copying services as well.

Beginning in 1984 plaintiff noticed a marked decrease in Sharp's demand for its services. This coincided with the establishment of Sharp's Corporate Purchasing Department designed to centralize Sharp's purchasing activities. Defendants Essenfeld and Sinoway, both Sharp employees, were responsible for supervising this Department.

Plaintiff alleges that defendants Essenfeld and Sinoway coordinated a bid rigging scheme to divert Sharp's printing jobs away from Printing Mart, and to "secure all of the printing work that Printing Mart had done for Sharp in the past for Laurriet Printing in the future". Laurriet Printing is a rival printing corporation.

In January 1986, plaintiff filed suit in state court against Sharp Electronics, its employees Essenfeld and Sinoway, and various other rival printing agencies who plaintiff believed to be participants in the fraud. See Exhibit A attached to defendant Laurriet Printing's Reply Brief. Plaintiff's state court complaint alleged tortious interference with its "prospective economic advantage" as the result of the bid rigging scheme. Plaintiff alleged that the defendants "conspire[d] to intentionally, maliciously and/or negligently exclude plaintiff from bidding on certain printing work to be done for Sharp Electronics". *See* Complaint, paragraph 3. Specifically, plaintiff asserted that defendants Sinoway and Rosenthal, president of Laurriet Printing, "caus[ed] defendants Laurriet, Pippert and Gemini to submit bids or quotations that appeared to be competitive but were in fact rigged to have the work given to defendant Laurriet". *Id.* [1]

---

1. Plaintiff's state court complaint also set forth a cause of action for defamation, and injury to reputation on behalf of both the Printing Mart corporation and its president, Lawrence Qualiano. *See* Counts Two and Three of the Complaint. As these claims have little relevance to a

Defendants moved to dismiss plaintiff's state court complaint for failure to state a cause of action in tort. Ruling on the pleadings, the state court judge dismissed the complaint, concluding as a matter of law, that a party to a contract, in this case Sharp electronics, cannot tortiously interfere with its own contract. Alternatively, the court ruled that absent a formal contract, Sharp was under no "obligation" to do business with Printing-Mart after 1981, thereby precluding any action for tortious interference. Plaintiff's appeal is currently pending before the Appellate Division.

Subsequent to the dismissal of the state court complaint, plaintiff gained access to various documents and information, including a report prepared for Sharp Electronics by an outside investigative service, detailing instances of insider bid rigging and outlining with particularity the kickback procedures used to defraud Sharp and Printing-Mart.

Plaintiff had not been aware of this report, prepared at the request of one of Sharp's officers and completed in December 1985, at the time it filed its state court suit. See Plaintiff's Exhibit E. Plaintiff first learned of the report in May 1986 after a former Sharp employee, Thomas Harofilis, disclosed its contents to Lawrence Qualiano, president of Printing Mart. See Affidavit of Thomas Hartofilis, Plaintiff's Exhibit F.[2]

The report seemingly corroborates plaintiff's allegations that defendants Essenfeld and Sinoway conspired with Rosenthal, president of Laurriet Printing, to circumvent the legitimate bidding process and guarantee that Laurriet received the vast majority of Sharp's printing jobs. The report documents how Rosenthal would call Sinoway and in the course of a phone call would fabricate phoney bids on behalf of Printing-Mart and other vendors, so that Laurriet's bid always appeared lower than the "fictitious" competition. Alternatively, Sinoway and/or Essenfeld would disclose Printing Mart's confidential bids to Laurriet before the bid deadline thereby insuring that Laurriet would be able to enter a more competitive offer. The report suggests that federal and state criminal statutes were being violated by the acts alleged, and that Printing Mart was the target of these activities.

On September 5, 1986, plaintiff filed suit in federal court charging defendants with violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. Section 1962 et. seq. Plaintiff alleges that Essenfeld and Sinoway, through defendant Sharp Electronics, and Rosenthal, through defendant Laurriet Printing, constituted an enterprise within the meaning of RICO and that this enterprise engaged in a pattern of racketeering activity to defraud Sharp through a bid rigging and kickback scheme with Laurriet Printing. Plaintiff was injured by these racketeering acts because it was denied legitimate bidding opportunities. According to the plaintiff, the information provided by Mr. Harofilis was necessary to perceive the enterprise and to plead the RICO violations with the specificity required of a RICO plaintiff.[3]

Defendants now move before this court to have plaintiff's federal RICO claim dismissed.[4] Defendants argue that plaintiff is

---

determination of claim preclusion betwee the state and federal suits, the court does not address them in its opinion.

**2.** After filing the federal RICO complaint plaintiff obtained a copy of the investigative report through discovery. See Exhibit E attached to Plaintiff's Brief.

**3.** RICO plaintiffs are required to plead the alleged fraud with particularity as set forth in Rule 9(b) of the Federal Rules of Civil Procedure. Courts have been careful to require specificity in RICO actions recognizing that a false charge of racketeering can damage a defendant's reputation. See Seville Machinery Corp v. Southmost Machinery Corp, 742 F.2d 786 (3rd Cir.1984), cert denied, 469 U.S. 1211, 105 S.Ct. 1179, 84 L.Ed.2d 327 (1985); see also Spencer v. Agency Rent-a-Car, Inc., Fed.Sec.L.Rep. (CCH) Section 98,361 at 92,217 (D.Mass.1981).

**4.** Defendants Rosenthal and Laurriet Printing are represented by separate counsel from defendants Essenfeld, Sinoway and Sharp Electronics. These defendant groups have each submitted separate briefs, but all make the same arguments in favor of dismissal.

barred from bringing this duplicative suit both on the grounds of claim preclusion under New Jersey's "entire controversy" pleading requirement, and collateral estoppel or issue preclusion.

## DISCUSSION

### I. Claim Preclusion

Defendants argue that plaintiff's failure to raise the RICO claim in its state court action precludes prosecution of this claim in a subsequent federal court proceeding. This court is compelled to agree.

■ According to the dictates of the full faith and credit clause, 28 U.S.C. Section 1738, this court must apply New Jersey law to determine the preclusive effect of the state court disposition.[5] Under New Jersey law, claim preclusion is governed by the "entire controversy" doctrine, a broad policy against claim splitting. New Jersey Rules of Court R.4:27–1(b).[6] The doctrine, strictly adhered to by New Jersey courts, mandates that a plaintiff "must seek complete relief for vindication of the wrong he charges" in a single legal action. *Tancrel v. Mayor & Council of Tp of Bloomfield,* 583 F.Supp. 1548 (D.N.J.1984). Specifically, the doctrine requires a party "to litigate all aspects of a controversy in a single legal proceeding" and precludes subsequent litigation of related claims, even those capable of independent adjudication. *Mori v. Hartz Mountain Development Corp.,* 193 N.J.Super. 47, 52–53, 472 A.2d 150 (App.Div.1983).

As noted by the Third Circuit in *Melikian v. Corradetti,* 791 F.2d 274 (1986), "the entire controversy doctrine reaches more broadly than the 'same cause of action' requirement of traditional res judicata doctrine", at 279. It is instead a "transaction-based" doctrine as described in the Restatement (Second) of Judgments, Section 24 (1982):

(1) When a valid and final judgment ... extinguishes the plaintiff's claim pursuant to the rules of merger or bar ... the claim extinguishes all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose. Therefore, "[u]nder the entire controversy doctrine, 'the entire controversy', rather than its constituent causes of action, is the unit of litigation and joinder of all such causes of action is compulsory under penalty of forfeiture." *The Malaker Corp. v. First Jersey National Bank,* 163 N.J.Super. 463, 496, 395 A.2d 222 (App.Div.1978).

The entire controversy doctrine precludes subsequent litigation not only of those claims previously litigated, but of *all* claims arising out of the same controversy that could have been raised in the earlier action. Furthermore, the entire controversy doctrine applies both to subsequent actions asserting different legal theories and those requesting alternative relief. *Melikian, supra,* 791 F.2d at 279.

It is beyond dispute that the RICO claim here asserted arises from the same "series of transactions" that gave rise to plaintiff's state tort claim. Both causes of action stem from the alleged bid rigging scheme, and both rely on the same set of operative facts to state a claim. A comparison of the factual allegations made in the state and federal complaints shows them to be virtually identical. For example, the state court complaint alleges that:

---

**5.** There is nothing in the language of the federal RICO statute to indicate that it repeals and/or supercedes the full faith and credit clause. While various courts have split on the determination of this issue, the Seventh Circuit recently ruled that the statutory language of RICO, "does not provide any reason to believe that any part was intended" to relieve federal courts of their obligation to apply state preclusion law to state court decisions. *See County of Cook v. Midcon Corp.,* 773 F.2d 892 (7th Cir.1985). The Supreme Court has reached the same conclusion

with respect to other statutes. *See Kremer v. Chemical Construction Corp.,* 456 U.S. 461, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982) (no partial repeal in Title VII); *Allen v. McCurry,* 449 U.S. 90, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980) (no partial repeal in Section 1983).

**6.** Rule 4:27–1(b) states: "Mandatory joinder. Each party to an action shall assert therein all claims which he may have against any other party thereto insofar as may be required by application of the entire controversy doctrine".

(1) "[i]n furtherance of the conspiracy defendants Rosenthal and Sinoway did cause defendants Laurriet, Pippert and Gemini to submit bits [sic] or quotations that appeared to be competitive but were in fact rigged to have the work given to the defendant Laurriet". *See* paragraph 3, Count One of Plaintiff's state court Complaint;

(2) that these fictitious bids "were transmitted in a single telephone conversation by defendant Rosenthal to defendant Sinoway, on behalf of defendants Laurriet, Pippert and Gemini with the knowledge and consent of defendants Essenfeld and Sinoway for the purpose of awarding the contract to defendant Laurriet". *See* paragraph 4, Count One of Plaintiff's state court Complaint;

(3) and that defendant Sinoway, "with knowledge that plaintiff Printing Mart's bid ... was less than defendant Laurriet's bid", "called defendant Rosenthal to obtain a second bid and did instruct him to come in with a figure" lower than Printing Mart's. *See* paragraph 6, Count One of Plaintiff's state court Complaint.

The federal RICO complaint similarly alleges that "[t]he plan or scheme of this enterprise involved the use of fictitious bidders and bids, disclosure of trade secrets in the form of bids and pricing of legitimate vendors; eliminating legitimate vendors from the bidding competition which enabled the enterprise to submit inflated printing bills to SHARP and obtain money by a fraudulent 'bid rigging and kickback scheme'. This scheme would be executed through the use of a specially devised purchasing procedure which enabled SINOWAY to steer the purchase order to LAUR-

RIET". See paragraph 29 of Plaintiff's Amended Federal Complaint.

Based on this comparison, the court finds that the conduct constituting "predicate acts" of the alleged RICO violation is the same conduct which plaintiff alleged as giving rise to a claim for tortious interference in its earlier action. As the RICO cause of action arises from the same "controversy" as the earlier tort claim, and the injury alleged—denial of the opportunity to compete—is the same, plaintiff's failure to assert the RICO claim in the state court proceeding presumptively bars plaintiff from litigating the RICO claim before this court. The valid and final judgment of the state court extinguished plaintiff's right to re-litigate any cause of action stemming from the alleged bid rigging scheme.[7]

Yet, plaintiff challenges the applicability of the entire controversy doctrine to the facts at hand. Plaintiff notes that its federal complaint alleges RICO violations or "predicate acts" committed subsequent to the state court dismissal. *See* Counts X, XI, XII, XIII. Plaintiff claims that the "ongoing and continuous" nature of defendants fraudulent conduct serves to renew the bid rigging violations and thereby revive plaintiff's RICO cause of action. Plaintiff urges this court to find that litigation of the post-judgment predicate acts cannot be barred under the entire controversy doctrine.

■ Yet plaintiff's argument misperceives the very purpose of the entire controversy rule. As explained above, the entire controversy doctrine is a "transaction" based doctrine. It explicitly precludes subsequent litigation even of "renewed", independent causes of action that derive from

**7.** New Jersey Court Rule 4:37–2(d) provides that a dismissal for failure to state a cause of action is a decision on the merits for *res judicata* purposes. *See* 1 B. Moore, *Federal Practice,* Section 0.409 [1] 2d Ed.1942. The parties agree that the state court ruling was a final judgment.

Plaintiff though challenges the validity of the state court judgment alleging that the judgment was obtained by fraud. This court finds no support in the record for this bald assertion. Plaintiff contends that defendants obstructed plaintiff's discovery efforts and wrongfully with-

held information necessary to plead the RICO claim until after a final decision was rendered. Yet, there is no evidence that any delay in discovery prior to the state court dismissal was maliciously motivated. *See* Affidavit of Michael Meisel; *see also* Reply Certification to Meisel Affidavit. Moreover, this court concludes that plaintiff had sufficient information to plead its RICO claim at the time it instituted the state court action such that the lack of discovery cannot excuse plaintiff's failure to raise this claim.

the "transaction" already the subject of a final judicial judgment. *See Melikian, supra,* ("The entire controversy doctrine reaches more broadly than the same cause of action requirement".) Therefore, the entire controversy doctrine bars subsequent litigation even where the allegedly unlawful "transaction", (in this case the bid rigging scheme), is of a continuous and ongoing nature such that new violations ("predicate acts") occur over time. *See Giammario v. Trenton Bd of Ed.,* 203 N.J.Super. 356, 497 A.2d 199 (App.Div.1985).

In order to avoid the preclusive effect of the entire controversy doctrine, plaintiff must demonstrate that it was "unable" to raise the RICO violations in state court. "Previous judgments cannot be given the effect of extinguishing claims which did not exist and which could not possibly have been sued upon in the previous case". *Lawlor v. National Screen Service,* 349 U.S. 322, 75 S.Ct. 865, 99 L.Ed. 1122 (1955); *see also Spiegel v. Continental Illinois National Bank,* 609 F.Supp. 1083 (D.C.Ill. 1985). To overcome the bar of claim preclusion, plaintiff must demonstrate either that the state court lacked jurisdiction over the federal RICO claim, or that plaintiff did not have sufficient knowledge at the time of the state proceeding to establish a "pattern of racketeering". Neither of these considerations warrants an exception to the entire controversy doctrine in this case.

This court would not be compelled to apply the entire controversy doctrine, if plaintiff could demonstrate that RICO confers exclusive jurisdiction in the federal courts and therefore could not have been litigated in the state court proceeding. The case law though is indeterminate on this issue.

Many district courts have concluded that state courts have concurrent jurisdiction over federal RICO claims. *See Chas Kury Co. v. Lomardi,* 595 F.Supp. 373, 381 n. 11 (E.D.Pa 1984); *Carman v. the First National Bank,* 642 F.Supp. 862 (W.D.Ky.

1986); *Karel v. Kroner,* 635 F.Supp. 725 (N.D.Ill.1986). These courts adopt the long standing presumption that state courts have concurrent jurisdiction over federal statutes unless Congress specifies otherwise "by an explicit statutory directive, by unmistakable implication from legislative history, or by clear incompatibility between the state court jurisdiction and federal interests." *HMK Corp v. Walsey,* 637 F.Supp. 710, 717 (E.D.Va.1986), citing *Gulf Offshore Co v. Mobil Oil Corp.,* 453 U.S. 473, 478, 101 S.Ct. 2870, 2875, 69 L.Ed.2d 784 (1981).

Other district courts, as well as the only New Jersey court to have addressed the issue, have rejected the presumption in favor of concurrent jurisdiction, reasoning that RICO is modeled after federal antitrust law which confers exclusive jurisdiction in the federal courts. *See Maplewood Bank & Trust Co v. Acorn, Inc.,* 207 N.J. Super. 590, 204 A.2d 819 (Law Div 1985); *Kinsey v. Nestor Exploration, Ltd.,* 604 F.Supp. 1365 (E.D.Wash.1985). Recently though, the Seventh Circuit in *County of Cook v. Midcon Corp.,* 773 F.2d 892 (7th Cir.1985), questioned the analogy of RICO to the Clayton Act, commenting, in dicta, "[w]e doubt whether the analogy to antitrust law is sufficiently strong to conclude that because jurisdiction over antitrust cases is exclusively federal, RICO jurisdiction necessarily must follow suit, ... [p]articularly in light of the normal presumption that state courts share concurrent jurisdiction over federal statutes ..." *Id.,* at 905, n. 4.[8]

■ This court is reluctant to finally resolve the question of RICO jurisdiction absent any guidance from the Third Circuit. Nevertheless, it notes that there is persuasive authority for the proposition that state courts share concurrent jurisdiction. Without deciding the jurisdictional question, this court finds that plaintiff was required to raise its RICO violations in the

---

**8.** The state trial court in *Maplewood Bank & Trust,* supra, did not have access to the Seventh Circuit's opinion before issuing its own and therefore made no effort to distinguish the Seventh Circuit's logic. In fact, the state court in

*Maplewood* relied on the earlier trial court opinion in *Midcon,* which, contrary to the later circuit opinion, rejected the notion of concurrent RICO jurisdiction.

state action for the reasons set forth below.

First, given the conflict of authorities on the issue of RICO jurisdiction, arguably, plaintiff was obliged to assert its RICO claim before the state court and submit the jurisdictional question to that court for independent determination. If the state court had ruled that it lacked jurisdiction, then plaintiff might have plausibly argued that the entire controversy doctrine should not apply to bar subsequent consideration of the RICO claim by a federal court of competent jurisdiction. The entire controversy doctrine places the burden on the plaintiff to raise all possible claims in a single legal proceeding. Where, as here, plaintiff makes no attempt to have a particular cause of action considered in its initial proceeding, subsequent consideration is precluded.

Second, New Jersey has a RICO statute analogous to federal RICO, "little RICO", N.J.S.A. 2C:41–1 et seq.. Even assuming that the state court lacked jurisdiction over plaintiff's federal RICO claim, plaintiff would still have been able to assert the New Jersey RICO analogue. Aware that failure to join any related causes of action in the initial legal proceeding would result in forfeiture of those claims; plaintiff's failure to assert its RICO allegations under the New Jersey RICO statute suggests a conscious withholding of this claim, in violation of the entire controversy doctrine. Preclusion is properly imposed to deter suits that "appear to be part of a conciously chosen tactic" to bifurcate litigation of related claims. *See Hotel Corp of South v. Rampart 920 Inc.*, 46 B.R. 758, 769 (E.D. La.1985) *aff'd without opinion*, 781 F.2d 901 (5th Cir.1986); *Wm Blanchard Co v. Beach Concrete Co.*, 150 N.J.Super. 277, 375 A.2d 675 (App.Div.1977); *HMK Corp v. Walsey*, 637 F.Supp. 710, 716 (E.D.Va.1986) (plaintiff should be precluded from "electing a piecemeal approach").

Plaintiff's failure to allege either the federal or state RICO claims in its state court action warrants preclusion of these claims before this court.

Plaintiff might still avoid the harsh effect of preclusion if plaintiff could demonstrate that it lacked the information necessary to make out a RICO violation at the time it filed its state suit.

Plaintiff argues that while it was able to allege a "conspiracy" in its state court complaint, under the requirements of RICO, a conspiracy is not the equivalent of a "pattern of racketeering", and consequently, a conspiracy is not an actionable RICO violation. *See Sedima S.P.R.L. v. Inrex Co.*, 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985); *McClendon v. Continental Group*, No. 83–1340 Slip.op. at 8 (D.N.J. July 31, 1986) [Available on WESTLAW, DCTU database]. Plaintiff contends that, at the time the state suit was initiated, it could not make out the "pattern" requirement as contemplated by the Supreme Court's analysis in *Sedima S.P.R.L. v. Inrex Co.*, 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). The court is forced to disagree.

The Supreme Court in Sedima defined a pattern as "a factor of continuity and relationship" between predicate acts. *Id.* This court, in *McClendon*, framed the relevant inquiry as follows: "whether the predicate acts are sufficiently numerous, related and ongoing to constitute a programmatic illegal infiltration of business". *McClendon, supra*, Slip.op. at 8.

■ Under either standard this court concludes that plaintiff had sufficient information to make out a RICO violation in its state proceeding. On the face of the complaint itself, plaintiff alleges a well entrenched, continuous conspiracy sufficient to establish an illegal infiltration of Sharp's, and consequently, plaintiff's business. The language of the complaint reveals plaintiff's awareness of ongoing racketeering activity by the defendants. *See* paragraph 2, First Count of Plaintiff's state court Complaint; ("Thereafter, defendant Essenfeld, acting in concert with defendant Rosenthal and defendant Lauriet did circumvent the aforesaid policy directive by ... maliciously and/or negligently depriving the plaintiff of the opportunity of [Sharp's] business transactions").

Furthermore, the complaint sets forth three or more specific "racketeering acts" sufficient to satisfy the RICO pleading requirement of at least two predicate acts. See 18 U.S.C. 1962 et. seq. Specifically, plaintiff alleges that on or about August 20, 1985 Rosenthal and Sinoway did cause defendants Laurriet, Pippert and Gemini to submit bids that while appearing competitive were in fact rigged to favor Laurriet printing. See paragraph 3, First Count. On or about September 20, 1985, in a phone call to Sinoway, and with Essenfeld and Sinway's consent, Rosenthal transmitted fabricated bids on behalf of various printing agencies so as to make Laurriet's bid lowest and ensure that Laurriet would receive a contract for Sharp manuals. See paragraph 4, First Count. Finally, on or about October 4, 1985, defendant Sinoway disclosed Printing Mart's confidential bid to Laurriet instructing Laurriet to come in with a lower bid, thereby depriving Printing Mart of its competitive rank. See paragraph 5, First Count.

The information contained in plaintiff's complaint readily permits a sufficiently specific RICO pleading. This court is convinced that plaintiff could have alleged its RICO claim and then, if necessary, amended to provide additional detail following discovery. The allegations made provide ample evidence of defendants' use of mails and interstate communications to permit assertion of the mail and wire fraud RICO violations.

The court recognizes that discovery of the investigative report furnished plaintiff with extensive additional detail concerning the alleged bid rigging and kickback scheme. Plaintiff is certainly correct in asserting that it did not know the intricacies of defendants' racketeering activities prior to disclosure of this information by Mr. Harofilis and receipt of the report. The relevant inquiry though is not whether plaintiff now knows more than it did at the time of filing the state court action, but rather, did it know enough at the time of the earlier legal proceeding to state a cause of action. For the reasons set forth in this opinion, the court is forced to conclude that plaintiff did have sufficient knowledge and that therefore the preclusive effect of the entire controversy doctrine must apply.

The court reaches this conclusion with great reluctance since it results in barring what appears to be a meritorious claim by the plaintiff. Moreover, a dismissal in this case does not comport with the underlying purpose of the entire controversy doctrine.[9] The doctrine exists to protect parties who have fully litigated a controversy from the burden of vexatious, duplicative litigation by the unsuccessful litigant. As the initial state court complaint was dismissed at the pleadings stage, the burden of defending this action was minimal. Furthermore, a close reading of the record reveals that the bid rigging issue was not actually litigated in the state proceeding. The state court's pronouncements on the existence of "legitimate competition" all go to the question of whether Printing Mart had exclusive contractual rights to do Sharp's printing, or whether Sharp was free to do business elsewhere; not whether any bid rigging was going on. See Transcript of State Court Proceedings, June 6, 1986, Plaintiff's Exhibit B at 17, 24. Nevertheless, the rigid requirement to assert all aspects of a single controversy in a single legal proceeding applies where, as here, the plaintiff was able, but chose not to, raise its RICO claim in the earlier action.

The court takes some small comfort from the fact that the state court action is now on appeal, and although the decision below is likely to be affirmed, the state court may grant plaintiff leave to amend, particularly since this forum is now closed to it.

9. Preclusion under the entire controversy doctrine is generally appropriate only after there has been an opportunity to amend pleadings where necessary to encompass additional claims. See Ajamian v Schlanger, 14 N.J. 483, 103 A.2d 9, cert. denied, 348 U.S. 835, 75 S.Ct. 58, 99 L.Ed. 659 (1954). Yet in this case, plaintiff did not request leave to amend its complaint at any time prior to dismissal. This court notes that had plaintiff requested leave to amend the complaint, the state trial court could, in its discretion, have granted plaintiff leave to incorporate the RICO claims before it dismissed the action.

Having determined that plaintiff's complaint is precluded under the entire controversy doctrine, the court need not reach defendant's arguments on the issue of collateral estoppel.

For the reasons set forth above, this court grants defendants motion and hereby dismisses Printing Mart's RICO complaint.